1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

United States of America,

Plaintiff,

v.

Larry Seng In,

Defendant.

Case No. 2:20-cr-00095-ART-BNW

**REPORT AND RECOMMENDATION**

10      Mr. In is charged in an indictment with being a felon in possession of a firearm, in

11   violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). ECF No. 5. Mr. In was indicted after a gun

12   was found in his car on March 4, 2020. Mr. In now asks this court to suppress the gun. ECF 35.

13   The government opposed Mr. In's motion at ECF No. 38, and Mr. In replied at ECF No. 40. The

14   court held an evidentiary hearing on August 5, 2021. ECF No. 43. Subsequently, both parties

15   submitted supplemental briefing. ECF Nos. 53, 54.

16      The questions before this court are (1) whether Mr. In was subject to an arrest that lacked

17   probable cause at the time he was handcuffed or, alternatively, (2) whether the stop was otherwise

18   prolonged without reasonable suspicion when officers ran "Triple I" (a national records check).

19   To answer these questions, the court summarizes the relevant testimony, makes its factual

20   findings, summarizes the parties' arguments, and conducts its legal analysis.

21   **I.    Testimony**

22      **A.    Officer Diaz's Testimony**

23      Officer Diaz testified as follows: On March 4, 2020, he was a patrol officer and assigned

24   himself to work with Officers Andersen and Nye, all "bike squad" officers with the Las Vegas

25   Metropolitan Police Department (LVMPD).[1] ECF 52 (transcript) at 10-12, 16. He knew Andersen

26   well as they graduated from the same academy. *Id*. at 17. He was familiar with the way she

27

28

---

[1] Diaz explained he was originally a solo unit but assigned himself to work with Andersen and Nye, as they do not patrol by themselves. *Id*. at 16.

conducts herself and can read her body language and visual cues if she has any concerns. *Id.* at 19. The three officers were patrolling the area close to 3645 South Las Vegas Boulevard, which is a "hot zone" for narcotic activity. *Id.* at 21. Despite describing the area as being known for drug trafficking, on cross-examination Diaz could not provide specifics regarding the number of arrests for this type of conduct. *Id.* at 21, 70-71.

On the day in question, they observed a white Lexus with California plates parked in a red zone with a taillight out, both of which are traffic infractions. *Id.* at 23-24. Diaz identified the defendant, Mr. In, as the driver of the car. *Id.* at 25, 32. According to Diaz, Mr. In was parked for an unreasonable amount of time and the car was facing toward Las Vegas Boulevard, which was consistent with drug activity. *Id.* at 21, 41. Based on this, he also thought Mr. In might be armed. *Id.* at 41-42. Despite his concerns about these facts, on cross-examination Diaz stated that he did not see anyone approaching or leaving the car or any hand-to-hand transaction. *Id.* at 71. He also testified that he was not concerned for his safety when he initially approached Mr. In's car. *Id.* at 71-72.

Diaz talked about the safety concerns inherent in car stops: they can be dynamic situations, as officers do not know who or what may be inside vehicles. *Id.* at 11-12. There are additional concerns when patrolling on a bicycle: officers are more exposed; cars can leave and officers cannot catch them; and the bicycles are not as well equipped as patrol cars. *Id.* at 14. At the time Mr. In was stopped, officers could not run license plates before contacting the driver.[2] *Id.* at 15. Due to the additional safety concerns that patrolling on a bicycle presents, officers work with at least one other officer. *Id.* at 16.

On the night in question, Diaz approached Mr. In, who was the only person in the car. *Id.* at 23-24. As mentioned previously, at that point Diaz was not concerned for his safety. *Id.* at 71-72. He requested Mr. In's driver's license, registration, and insurance. *Id.* at 26. Mr. In complied and did not argue with him. *Id.* at 72.

---

[2] Andersen testified that this is no longer the case and that officers patrolling on bicycles can now "run people." *Id.* at 119.

Diaz explained that to ensure officer safety, it is typical to visually inspect the inside of a car as police approach the driver. *Id*. at 26. While Andersen conducted a safety sweep of the car, she made a gesture to Diaz to remove Mr. In from the car. *Id*. at 32-33. Based on the gesture Andersen made, Diaz believed there was a threat at hand, making him concerned for his safety. *Id*. at 34-35, 91.

Diaz opened the door to Mr. In's car. *Id*. at 73. Diaz moved the papers on Mr. In's lap to the passenger seat. *Id*. at 73. Andersen told Diaz to ensure Mr. In kept his hands up. *Id*. at 35. In turn, Diaz ordered Mr. In to "keep his hands up where he could see them." *Id*. at 36. Andersen's remark also made him concerned for his safety. *Id*. at 36, 91. Next, Diaz placed his hand on Mr. In's left wrist for better control of Mr. In's movements. *Id*. at 36. Diaz unbuckled Mr. In and pulled him out of the vehicle. *Id*. at 36, 75. He explained that he took these actions based on safety concerns. *Id*. at 37. All three officers were in uniform, which included a radio and a holstered gun, and were surrounding Mr. In at this time. *Id*. at 77-79. Mr. In was compliant. *Id*. at 78. Diaz also stated that, at that time, he had no information regarding Mr. In's criminal history. *Id*. at 75. He was also aware that Nevada was an open carry state. *Id*. at 98.

Diaz explained that Andersen asked Mr. In if Mr. In had a weapon in the car, and Mr. In said "no." *Id*. at 38. Diaz patted Mr. In down because he believed there was a weapons threat. *Id*. at 38. As he began the pat down, Andersen mentioned a "Glock," which Diaz knew to be a weapon. *Id*. at 39. This made Diaz believe Mr. In may have a weapon on him. *Id*. at 39. In addition, the car was in a drug trafficking area, and it is not uncommon for individuals who are dealing drugs to possess firearms. *Id*. at 42. Ultimately, the pat down revealed that Mr. In did not have any weapons or contraband on him. *Id*. at 75.

Diaz also testified that Andersen asked Mr. In a second time as to whether there were weapons in the car. *Id*. at 42. Mr. In again said there were none. *Id*. at 43. At that point, Andersen confronted Mr. In about the Glock in the car. *Id*. at 43. Mr. In did not respond, and Andersen said, "you don't know now?" *Id*. at 43-44. Mr. In had not been Mirandized at that point. *Id*. at 79. He appeared nervous. *Id*. at 44. Eventually, he said he had come back from the shooting range. *Id*. at 45-46. Diaz found that response suspicious, given that Mr. In was in sandals and people do not go

to the range with open toed shoes because they can burn their feet with the hot casings that are expelled from guns. *Id.* at 46-47. Mr. In's response, after having lied twice about the gun, increased Diaz's suspicions. *Id.* at 47. So, Officer Diaz said, "do we look new?" *Id.* at 46.

As Mr. In answered these questions, Diaz started developing reasonable suspicion that "something else was afoot as opposed to just a traffic violation." *Id.* at 82. He explained that no questions were asked regarding the parking violation or the taillight because the questioning was focused on "the facts that weren't known, which was the firearm." *Id.* at 86-87.

Diaz explained that typically drivers who have firearms in the car are forthcoming and tell him right away. *Id.* at 48. When people lie about the presence of guns, it leads Diaz to believe that they are hiding something. *Id.* at 49. In addition, those who are lawfully in possession of guns keep them holstered, in a box, or locked away in a compartment—not thrown amongst other items. *Id.* at 50-51.

Among other questions asked, Andersen asked Mr. In if he had ever been arrested. *Id.* at 44. Mr. In said he had, in California. *Id.* at 44-45.

Diaz handcuffed Mr. In due to officer safety concerns. *Id.* at 51. He explained that he did not have a vehicle to put Mr. In into, and he was dealing with a person who was possibly armed. *Id.* at 51-52. Handcuffing him would "alleviate [him] from the added stress of having him, you know, just amongst us with a potentially unsecured firearm." *Id.* at 52. Handcuffing him allowed him to continue with his investigation without worrying about whether Mr. In could get into his vehicle. *Id.* at 51-52. This was a temporary detention, as Mr. In would have been allowed back in his car if they learned that he could lawfully possess the gun. *Id.* at 53-54. Mr. In continued to follow all instructions. *Id.* at 76. All three officers were still surrounding Mr. In. *Id.* at 77. Officer Diaz testified that they positioned themselves "in an advantageous position to make sure that [the] firearm is not reached." *Id.* at 95.

Diaz then walked Mr. In over to the sidewalk. *Id.* at 84. Diaz read Mr. In his *Miranda* rights, which Mr. In acknowledged. *Id.* at 56. Mr. In asked if he was being arrested and was told he was not being arrested. *Id.* at 56-57. Diaz read Mr. In his *Miranda* rights because he had reasonable suspicion to believe criminal activity was afoot and did not want to ask Mr. In any

potentially incriminating questions prior to Mr. In understanding his rights. *Id*. at 57. Diaz explained that he was trained to provide *Miranda* warnings if he was in doubt that a person may give incriminating responses, to ensure the statements can later be used in court. *Id*. at 57. On cross examination, Diaz admitted that questions regarding the gun were also asked before Mr. In was Mirandized. *Id*. at 79, 85.

Diaz also asked Mr. In what he had been arrested for in California. *Id*. at 58. Mr. In said he had been arrested, "a long time ago for grand theft on a person." *Id*. at 58. Diaz explained that Nevada has a similar offense, grand larceny, which is a felony. *Id*. at 58. So, Diaz believed that Mr. In may have been arrested for a felony offense. *Id*. Mr. In also explained that he was no longer on probation, which increased Diaz's concerns and made him want to verify Mr. In's background before letting Mr. In back into his car. *Id*. at 59-60. During this questioning, Mr. In was surrounded by officers and not free to leave. *Id*. at 84.

Diaz then called a patrol unit for two reasons: (1) to render the scene safer and (2) to run Mr. In's criminal history. *Id*. at 60-61. Diaz testified that if they could do a consensual search of Mr. In's car, they could place the gun in the patrol car. *Id*. at 60. They could also expedite the stop by running his criminal history instead of calling Records for it. *Id*. at 61-62. Also, being able to run the criminal history would avoid potential miscommunications they might otherwise have with Records. *Id*. at 63. He explained that when he called the patrol unit, Andersen was on the phone with Records. *Id*. at 62, 96. It is typical for Records to put officers on hold given the number of calls from officers asking for records. *Id*. at 63. In addition, Diaz explained that relaying information over the phone could lead to miscommunications. *Id*.

Ultimately, Diaz learned that Mr. In had a prior felony conviction for grand theft in California and two felony convictions for sales of controlled substances. *Id*. at 63-66.

No citations were ever written for the traffic violations. *Id*. at 89.

Police ultimately located a gun behind the front passenger seat, on the floorboard, within immediate reach of the driver. *Id*. at 35-36.

1    **B.    Officer Andersen's Testimony**

2    Officer Andersen testified as follows: On March 4, 2020, she was a patrol officer with the

3    "bike squad" at LVMPD. *Id*. at 103. Officers Nye and Diaz were her partners that day. *Id*. at 105.

4    That evening, around 10:15 p.m., she saw a car parked in a red zone in an alley close to the

5    Bally's hotel. *Id*. at106-107. The taillight of the car was not working. *Id*. at 141.

6    As she approached the car, she smelled marijuana but acknowledged it is legal to smoke

7    marijuana in Nevada. *Id*. at 151. Mr. In was the only person in the car. *Id*. at 143. She had not

8    received any reports of criminal activity in that alley on that day, nor did she observe any hand-

9    to-hand transactions as she approached Mr. In's car. *Id*. at 146-147.

10    Diaz approached the driver's side of the car. *Id*. at 108. During that time, Andersen was

11    looking inside the vehicle with her flashlight to see if there were any weapons in the vehicle,

12    which is routine during traffic stops. *Id*. at 108. She saw a teal-colored firearm on the floorboard

13    behind the passenger seat. *Id*. at 110. The firearm was mixed in with clothing. *Id*. at 110.

14    As soon as she saw the firearm, she advised Diaz to remove Mr. In from the car. *Id*. at

15    111. She told Diaz to do this because Mr. In could easily reach that firearm and use it against

16    them. *Id*. at 112. She was also cognizant of the fact that Mr. In had not mentioned the presence of

17    the firearm in the car. *Id*. at 112. In short, she explained it was an officer safety issue and that she

18    wanted to separate Mr. In from the firearm. *Id*. at 112, 122. She also told Diaz to ensure that Mr.

19    In kept his hands up while directing him to get out of the vehicle. *Id*. at 112. Mr. In complied. *Id*.

20    at 158. He never made any sudden movements or attempts to reach for the gun. *Id*. at 155.

21    Once Mr. In was out of the car, she asked him whether there were any weapons in the car.

22    *Id*. at 112. He said, "no." *Id*. at 113, 123. His response was the same when she asked that question

23    a second time. *Id*. She also asked him if he had ever been arrested. *Id*. at 112. Mr. In stated he had

24    been arrested in California. *Id*. at 113. During that time, Mr. In was being patted down and

25    instructed to separate his feet. *Id*. at 169. Mr. In had not been Mirandized before Andersen asked

26    these questions. *Id*. at 173. Mr. In asked why he was being searched, and he was ignored. *Id*. at

27    162.

28

When Diaz had Mr. In's hands behind his back, Mr. In was not free to leave. *Id*. at 160. All three of the officers were surrounding Mr. In at that time. *Id*. at 160-161. When Mr. In was handcuffed, the only information officers had was that Mr. In was illegally parked, a taillight was out, he lied about the presence of the gun in the car, he had been arrested in California, and he stated he had just left the shooting range. *Id*. at 165, 191. He was placed in handcuffs because "of the firearm in his car that he failed to tell us about or tell the truth about." *Id*. at 171. Officers did not tell him he was handcuffed due to officer safety concerns or that he would be free to leave after his records were run. *Id*. at 165-166, 171.

Andersen then told Mr. In to answer questions honestly or else he would be in a lot of trouble. *Id*. at 165. She said this twice. *Id*. No *Miranda* warnings had been read at this time. *Id*. at 166. She also asked Mr. In, "am I speaking English?" *Id*. at 167. She asked this because Mr. In was not answering questions and had a thousand-yard stare. *Id*. at 166-167.

She also asked him if he was a felon. *Id*. at 168. But she would not have believed him if he said "no" because he had been lying the whole time. *Id*. at 169. He responded that he was not a felon. *Id*. at 169.

Eventually, Mr. In admitted to having a gun and explained that he had just come from the shooting range. *Id*. at 114. At that point, Andersen felt "something was off . . . that something wasn't right." *Id*. at 114. She explained that typically, when officers stop someone who is in lawful possession of a firearm, the driver will let them know that there is a gun in the car. *Id*. at 114-115. Mr. In did not do this. *Id*. at 115.

In situations in which officers are advised of the presence of a firearm, Andersen directs the driver out of the car, removes the gun, takes the ammunition and magazine out, and places it in the trunk. *Id*. at 116-117. She keeps the driver outside of the car until the investigation is complete. *Id*. at 117. She does this for officer safety reasons. *Id*. at 116-117. Every time she sees someone with a gun—regardless of whether there is reasonable suspicion to believe the person cannot possess one—she investigates and determines whether they can lawfully possess a gun.[3] *Id*. at 195.

---

[3] While the court is alarmed by this statement, it is ultimately not material to the court's conclusion.

At timestamp 2:57 on Andersen's bodycam, she called records to see if Mr. In had any local warrants or prior convictions. *Id*. at 124. Records can report whether the driver has any prior convictions in the state of Nevada. *Id*. at 118. If officers need information from out of state, then they ask Records to run a "Triple I." *Id*. at 118. This process can take up to 20 minutes, and if a Triple I is requested, it can be longer. *Id*. To speed things up, officers can call a patrol unit. *Id*. at 119. In situations such as this one, officers typically call a patrol vehicle for several reasons. *Id*. at 120. It is quicker: they can quickly figure out who the driver is and whether he is a felon. *Id*. Additionally, here, since there was an unsecured gun close to the strip, if something were to happen, the patrol vehicle could provide cover and concealment for the officers. *Id*. at 120, 126.

At timestamp 7:34 on her bodycam, Andersen told Diaz to get a patrol vehicle. *Id*. at 125. She did this because she thought they might be able to get a patrol vehicle before Records answered the phone. *Id*. It is also safer. *Id*.

Records answered at the 8:44 timestamp on her bodycam. *Id*. at 126. At the 9:07 timestamp, the patrol vehicle arrived. *Id*. at 127. Her sergeant was driving. *Id*. at 129. At that point, Andersen got off the phone with Records. *Id*. at 128. She does not remember exactly what Records said but she did not believe Mr. In had any local warrants or local prior convictions. *Id*. at 127. To confirm whether someone has a felony conviction from another state, they need to run Triple I. *Id*. at 178. She did not ask records to run a Triple I because it was more efficient for her to do it in the patrol vehicle and she likes to verify the information if it will be used as part of a warrant affidavit. *Id*. at 127, 128. Andersen testified that, sometimes, Records relays incorrect information—they believe there is a felony conviction on someone's record when there is not. *Id*. at 132. It is also loud near the strip; so, she prefers to verify the information herself. *Id*. at 132.

She asked her sergeant if she could run a Triple I check. *Id*. at 129. He said "yes." *Id*. She believed it was necessary to run the Triple I check because Mr. In stated that he had been arrested in California and they needed to figure out if he had been convicted of a felony offense. *Id*. at 129-130. In addition, Mr. In had not been truthful with officers. *Id*. at 130. She thought it would be quicker for her to run the Triple I in the patrol vehicle than to wait for Records. *Id*. at 130, 131.

1    Once she ran Triple I for Mr. In, she learned that he was a convicted felon. *Id*. at 132. It

2    was at that point that Mr. In was arrested. *Id*. at 134. Had the Triple I not revealed any felony

3    conviction, Mr. In would have been free to leave. *Id*. at 133.

4    **II.    Findings of Fact Based on Testimony and Body Camera Footage[4]**

5    Based on the evidence, the Court makes the following findings of fact: Officers Diaz,

6    Andersen, and Nye conducted a traffic stop after they observed a car illegally parked. *Id*. at 23,

7    106. The car's taillight was out, too.[5] *Id*. at 24, 141. The three officers were part of the "bike

8    squad" that day, patrolling on bicycles. *Id*. at 10, 14, 105, 120. The car was parked in an alleyway

9    close to Las Vegas Boulevard and had California plates. *Id*. at 35-42; Defense Ex B (Nye

10    bodycam) at 1:03.

11    Diaz approached the driver of the car, Mr. In. Defense Exhibit C (Diaz's bodycam) at 00-

12    00:30. Shortly thereafter, Mr. In began retrieving his registration and insurance information from

13    the glovebox. *Id*. at 00:23-00:53. As Mr. In was gathering paperwork, Andersen can be seen by

14    the passenger side of the car giving Diaz a signal and telling Diaz to "pull him out." *Id*. at 00:48-

15    00:54. She told Diaz to do so because she saw a gun in the car. ECF No. 52 at 110-111. She

16    wanted Diaz to separate Mr. In from the firearm for officer safety reasons, as the gun could be

17    used against them. *Id*. at 112, 122. She was also aware that Mr. In did not make it known to

18    officers that there was a gun in the car. *Id*. at 112.

19    At that point, familiar with Andersen's body language, Diaz felt there was a threat at hand

20    and was concerned for his safety. *Id*. at 17-19, 34-35, 91. He was not concerned for his safety

21    before that point. *Id*. at 71-72.

22    In response to Andersen's instruction, Diaz told Mr. In, "do me a favor and get out of the

23    car; don't reach for anything." Defense Exhibit C (Diaz's bodycam) at 00:58-1:01. Andersen told

24    Diaz to instruct Mr. In to keep his hands up, which caused Diaz to have additional concerns for

25

26    _____

    [4] The Court finds the officers' testimony credible, except as otherwise noted.

27    [5] While Officers Diaz and Andersen discussed this being a high drug area, none of their statements rise to the level of
    reasonable suspicion to believe that drug activity was afoot. And prior to Andersen seeing the gun in the car, there

28    was nothing to suggest that Mr. In may have had a gun in the car. As a result, since the court does not credit this
    testimony, detail regarding it is not relevant to the court's analysis.

1    his safety. ECF No. 52 (transcript) at 36, 91. Diaz followed Andersen's instructions and told Mr.

2    In to keep his hands up. Defense Exhibit C (Diaz's bodycam) at 1:02-1:03.

3        Diaz then removed the paperwork from Mr. In's lap and placed it on the passenger seat,

4    put his hand on Mr. In's left wrist, unbuckled him, and assisted Mr. In in getting out of the car

5    while telling him to keep his hands up.[6] *Id*. at 1:08-1:21. He did this to ensure officers' safety.

6    ECF No. 52 at 37.

7        As soon as Mr. In was out of the car, Andersen asked if he had any weapons in the car.

8    Defense Exhibit D (Andersen bodycam) at 1:38-1:39. Mr. In said, "no." *Id*. at 1:39. She asked

9    him if he had ever been arrested. Defense Exhibit C (Diaz's bodycam) at 1:30. Mr. In said he had,

10   in California, for marijuana. *Id*. at 1:35-1:38. Andersen asked, "what else?" and Mr. In said,

11   "that's it." Defense Exhibit D (Andersen's bodycam) at 1:50-1:51.

12       Diaz started patting Mr. In down around the time that Andersen asked about his prior

13   arrests. *Id*. at 1:27-1:34. Diaz patted down Mr. In because he believed there was a weapons threat.

14   ECF No. 52 at 38. While Diaz stated he also believed Mr. In may have been armed because this

15   was a high drug area, there is nothing in the record to suggest that Mr. In was involved in drug

16   trafficking and the court does not credit this testimony.

17       While Diaz was patting Mr. In down, Mr. In asked why he was being searched. Defense

18   Exhibit C (Diaz's bodycam) at 1:43. He was ignored and, almost immediately, Andersen asked

19   again if there were any weapons in the car. *Id.* at 1:43-1:45; ECF No. 52 at 162. Mr. In again said,

20   "no." Defense Exhibit D (Andersen's bodycam) at 1:57.

21       At this time, Diaz started handcuffing Mr. In. Defense Exhibit C (Diaz's bodycam) at

22   1:47. Diaz handcuffed Mr. In due to officer safety concerns. ECF No. 52 at 51. He explained that

23   he did not have a vehicle to put Mr. In into, and he was dealing with a person who was possibly

24   armed. *Id*. at 51-52. Handcuffing him would "alleviate [him] from the added stress of having

25   him…just amongst us with a potentially unsecured firearm." *Id*. at 52. Handcuffing Mr. In

26   allowed Diaz to continue his investigation without having to worry about whether Mr. In could

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [6] While Diaz testified that he "pulled" Mr. In out of the vehicle, he also testified he used no force, which the
     bodycam reflects. Defense Exhibit C (Diaz Bodycam) at 1:08-1:21.

get into his vehicle. *Id*. at 51-52. Andersen stated that officers handcuffed him because there was a gun in the car, and Mr. In lied about it. *Id*. at 171.

While Diaz was handcuffing Mr. In, Andersen grabbed Mr. In's ID from the top of the car and asked, "why is there a Glock back there?" Defense Exhibit C (Diaz's bodycam) at 1:45-1:47, ECF No. 52 at 117. Mr. In remained silent for a few seconds and Andersen said, "You don't know now?" Defense Exhibit C (Diaz's bodycam) at 1:47-1:52. After a few seconds of silence, Mr. In stated that he had just left the shooting range. Defense Exhibit D (Andersen's bodycam) at 2:05. This was a suspicious answer given that individuals typically do not go to shooting ranges in sandals. ECF No. 52 at 47. Thus, Diaz said, "in sandals? do we look new to you?" Defense Exhibit C (Diaz's bodycam) at 1:56-1:59. Diaz became even more suspicious after that. ECF No. 52 at 47.

Andersen also thought something "was off" and "not right." *Id*. at 114. Typically, people who lawfully have guns in their cars will let officers know, and Mr. In did not. *Id*. at 114-115. Additionally, Mr. In was not telling the truth and was being evasive. *Id*. at 116.

Diaz also believed something else was going on—not just a traffic violation. *Id*. at 82. He echoed Andersen's testimony and stated that, in his experience, people who have guns in their cars are forthcoming about their presence. *Id*. at 48. It has also been his experience that those who lawfully possess guns keep them in holsters or locked in a compartment—not thrown among other items in their cars. *Id*. at 50-52.

Right after Mr. In said that he had been at the shooting range, Andersen told Mr. In that he had to answer questions honestly or he would be in a lot of trouble. Defense Exhibit C (Diaz's bodycam) at 2:01-2:04. She asked if he understood and added, "am I speaking English?"[7] *Id*. at 2:06; ECF No. 52 at 166-167. Andersen repeated herself by telling Mr. In to answer honestly or he would be in a lot of trouble. Defense Exhibit C (Diaz's bodycam) at 2:08-2:10. Diaz ordered Mr. In to separate his feet as he was finishing the pat down while Mr. In was in handcuffs. *Id*. at 2:10. Ultimately, the pat down revealed no weapons or contraband. ECF No. 52 at 75.

---

[7] While the defense correctly suggests that this comment may have been offensive to Mr. In, the remark does not bear on the ultimate issues in this case.

Next, Andersen asked Mr. In if he was a felon, and Mr. In said, "no." Defense Exhibit C (Diaz's bodycam) at 2:11-2:13. She asked whether "that" (referring to the gun) belonged to him; he said, "yes." *Id*. at 2:14-2:16. She asked why he was so nervous. *Id*. at 2:16-2:17. While not clear, Mr. In appears to say something like, "I didn't do nothing. I was just sitting in my car." *Id*. at 2:18-2:20. At that point, Andersen explained to him for the first time that they stopped him because he was parked in a no-parking zone and his taillight was out. *Id*. at 2:21-2:32.

As Mr. In is walked over to the sidewalk, Andersen looked at Mr. In's California driver's license and asked if he had been arrested "out here." *Id*. at 2:40-2:42. Mr. In said, "no." *Id*. at 2:44. When asked the same question again, Mr. In said he had never been in trouble in Las Vegas. *Id*. at 2:52-2:55.

It is around this time that Andersen calls Records. Defense Exhibit D (Andersen's bodycam) at 3:15; ECF No. 52 at 124. Records could tell Andersen whether Mr. In had any prior convictions in the state of Nevada. ECF No. 52 at 118. To get information about other states, officers would need to run a Triple I, which is a national record check. *Id*. at 118.

While Andersen called Records, she told Diaz to "read him […] just to be safe." Defense Exhibit D (Andersen's bodycam) at 3:22-3:23. Diaz then read Mr. In his *Miranda* rights. Defense Exhibit C (Diaz's bodycam) at 3:20-3:30. Mr. In stated that he understood his rights. *Id*. at 3:32.

Mr. In asked if he was being arrested. Diaz said, "no" and stated that he wanted Mr. In to understand his *Miranda* rights before they talked. Defense Exhibit C (Diaz's bodycam) at 3:40-3:47. Diaz then asked Mr. In about his prior arrests. *Id*. at 3:52. Mr. In said he had been arrested "a long time ago" for grand theft of a person in California and that he was no longer on probation. *Id*. at 3:53-4:01. This indicated to Diaz that Mr. In might have a prior felony conviction. ECF No. 52 at 58-59. When asked about his last arrest, Mr. In stated that he had a fight in jail eight years ago. Defense Exhibit C (Diaz's bodycam) at 4:14-4:27. Diaz told him to be honest with him because he could investigate his entire criminal history. *Id*. at 4:29. Mr. In responded that he was being honest and that he had not been in trouble for the last seven years. *Id*. at 4:30-4:37.

Mr. In again asked if he was being arrested and Nye replied, "who said anything about being arrested?" Defense Exhibit B (Nye's bodycam) at 8:28-8:31.

Diaz called a patrol unit. Defense Exhibit C (Diaz's bodycam) at 7:37. He did so to make the scene safer (as officers could place the firearm in the patrol vehicle if they performed a consensual search of the car) and to run Mr. In's criminal history. ECF No. 52 at 60. Diaz explained that this would be a faster and more accurate way to run Mr. In's criminal history. *Id*. at 63. Andersen was still on hold with Records when Diaz called for a patrol unit. Defense Exhibit C (Diaz's bodycam) at 6:10-7:37. Diaz testified it is typical for the Records department to place them on hold due to the volume of calls. ECF No. 52 at 63. Andersen's testimony echoed Diaz's. ECF No. 52 at 131, 192. Andersen was able to get Records on the line seconds before the patrol unit arrived. Defense Exhibit C (Diaz's bodycam) at 8:44-8:56; Defense Exhibit D (Andersen's bodycam) at 8:46-9:08; Defense Exhibit B (Nye's bodycam) at 9:48.

Andersen got off the phone with Records and learned that there were no local "hits" for Mr. In. ECF No. 52 at 127. She then told the fourth officer who arrived in the patrol car (her sergeant) that she was going to "Triple I him." Defense Exhibit D (Andersen's bodycam) at 9:49-9:57. Her sergeant explained that it was not illegal to have a firearm unless the person was prohibited from doing so. *Id*. at 10:15. Andersen stated that she knew that but that Mr. In was acting "sketchy." Defense Exhibit D (Andersen's bodycam) at 10:21. Andersen walked over to the patrol unit and got inside. *Id*. at 10:22-10:47. She was in the car for approximately two minutes. *Id*. at 10:47-12:41.

Officers confirmed Mr. In had prior felony convictions. ECF No. 52 at 65-66. Officers then searched the car pursuant to a search warrant and located the gun Andersen previously observed. ECF No. 52 at 134, 136. The gun was behind the front passenger seat, on the floorboard, within immediate reach of the driver. *Id*. at 35-36, 50.

Mr. In was surrounded by at least one (and up to three) officers at different times throughout the stop. Officers wore uniforms, including holstered guns. The interactions with him were generally cordial and respectful. Officer Andersen did become confrontational at times but never combative or aggressive. There was never any yelling, and no weapons were drawn. Mr. In was compliant at all times, and never attempted to reach for the gun or make any furtive

movements. Mr. In was never told that he was patted down and handcuffed for officer safety reasons or that he would be free to leave after officers ran his criminal record.

### III.   The Parties' Arguments

#### A.   Mr. In's Opening Brief

Mr. In argues that officers' use of force and their aggressive tactics, coupled with the restriction on his ability to move, was tantamount to an arrest; and the arrest was unlawful because, when he was arrested, there was no probable cause to believe that Mr. In was prohibited from possessing a firearm.

Specifically, Mr. In argues that the arrest took place soon after officers saw the firearm in the car. This is so, according to Mr. In, because officers ordered him to get out of his car with his hands up and to not reach for anything. Once out of the car, officers ordered him to spread his feet and patted him down. He maintains that he was compliant and that no weapons or contraband were found on him, but that officers still placed him in handcuffs. He points out that three officers surrounded him in an isolated alley, questioned him about the firearm and his criminal history, and threatened him with consequences if he lied. In addition, he asserts that officers never explained that he would be free to leave after investigating his ability to possess a firearm and that he was ignored when he asked why he was being searched. He also mentions that officers continued to ask questions regarding his criminal history while they walked him to the sidewalk, while handcuffed. Lastly, he highlights the fact that officers read him his *Miranda* rights, which typically takes place after a person is arrested.

Mr. In asserts that officers did not have probable cause to believe he was a prohibited person when he was arrested. At that time, officers had no information that Mr. In had felony convictions. In addition, he points out that Nevada is an open carry state. In short, he argues that officers did not become aware of his felony convictions until after the unlawful arrest had taken place. As a result, Mr. In asks the court to suppress all evidence stemming from the unlawful arrest.

1

### B.     The Government's Response

2      The government's response begins by pointing out that there was reasonable suspicion to

3  stop Mr. In, as he was illegally parked. The government continues by arguing that the events that

4  followed the observation of the gun (removing Mr. In from the car, patting him down, and

5  handcuffing him) were necessary for officer safety, as officers noticed a firearm within the

6  driver's reach.

7      Additionally, the government's position is that the officers' conduct was not tantamount to

8  an arrest: officers did not draw their weapons; Mr. In was not ordered to the ground; and no force

9  or aggressive language was otherwise used. In this same vein, the government points out that the

10  act of handcuffing someone does necessarily mean the person is under arrest. It also points out

11  that the area was not isolated—the alley was a few yards away from the Las Vegas Strip.

12  Moreover, the government argues that administering *Miranda* rights does not convert an

13  investigatory stop into an arrest. Thus, the government argues that an innocent, reasonable person

14  would have believed he was free to leave after officers determined whether he was in lawful

15  possession of a firearm.

16      In addition to arguing that officers treated Mr. In reasonably given officer safety concerns,

17  the government also argues that officers had a reasonable suspicion that Mr. In was prohibited

18  from possessing a firearm. The government argues that officers had reasonable suspicion because

19  (1) Mr. In lied when he stated there was not a firearm in the car; (2) he admitted that he had

20  previously been arrested; and (3) he gave conflicting accounts of what he was doing.

21      Lastly, the government maintains that the exclusionary rule should not apply even if the

22  court were to find that Mr. In was subject to an unlawful arrest. The government relies on the fact

23  that Mr. In had provided his identification to the officers *before* he was handcuffed. Thus, the

24  government argues that upon conducting a records check, which is routine, officers would have

25  discovered he was a felon. Thus, although not completely clear, the government seems to rely on

26  the inevitable discovery doctrine and/or the attenuation doctrine for the proposition that the

27  exclusionary rule should not apply.

28

### C.    Mr. In's Reply

Mr. In does not dispute that officers had to take safety precautions after observing the firearm, but he argues that the actions culminating in him being handcuffed were the equivalent of an arrest (which lacked probable cause and was not justified by officer safety concerns). He argues that this is particularly true since Nevada is an open carry state. He contends that everything that followed his handcuffing, even if it provided reasonable suspicion for a continued investigation, was tainted by the unlawful arrest. In addition, he distinguishes the cases the government cited for the proposition that handcuffing an individual does not transform a detention into an arrest.

Even if the officers' actions did not amount to an arrest, Mr. In argues that the stop was unlawfully prolonged when officers ran a national criminal record check after a local criminal records check revealed nothing to justify a continued detention.

Lastly, Mr. In argues that no exception to the exclusionary rule applies. His position is that the government cannot show that officers would have ultimately obtained information regarding Mr. In's prior felony convictions. He argues that officers would not have run the national records check and discovered that he had prior felony convictions if officers cited him and allowed him to leave after the local records check came back clean.

### D.    The Parties' Supplemental Briefing

#### i.    Mr. In's Supplemental Brief

Mr. In's supplemental brief relies on testimony adduced at the hearing to further argue that he was subject to an arrest. He explains that an officer ordered him out of the car with his hands in the air; the officer unbuckled his seatbelt; and the officer placed his hand on Mr. In's arm and held onto it as Mr. In exited the car. He was patted down and placed in handcuffs.

Three uniformed officers surrounded him, creating an especially coercive situation, given that nobody told Mr. In why he was stopped or handcuffed. This was coupled with an accusatory interrogation and sarcasm. Additionally, he was Mirandized, which would suggest to the average person that he was under arrest. While Diaz told him that he was not under arrest, Diaz continued

questioning him without explaining why he was being held in handcuffs. He argues that no reasonable person would have felt free to leave in these circumstances.

Again, Mr. In explains that probable cause was lacking because, at the time that he was handcuffed, officers only knew that there was a firearm in the car, that he had been arrested in California, and that he was not a felon (based on his statements). Thus, he argues, based on that information and the fact that Nevada is an open carry state, there was no probable cause for his arrest.

In addition, he contends that running the national records check unlawfully prolonged the stop. That is, Andersen already had the results of the local records check, which came back clean. In addition, he points out that Andersen could have asked Records to run a national records check at that time. By then, officers had already taken reasonable safety precautions and could have placed the firearm in the trunk of Mr. In's car, too. Thus, officers should have simply cited him and allowed him to leave. Instead, Andersen decided to personally run the Triple I. which involved calling and waiting for a patrol car to arrive. This added time to the stop and was not supported by reasonable suspicion, because all the information officers had regarding Mr. In followed the unlawful arrest. Thus, Mr. In argues, all evidence following the unlawful arrest must be suppressed.

### ii.    The Government's Supplemental Brief

The Government contends that Mr. In was not initially arrested but rather lawfully detained. This detention was justified by officer safety concerns and a reasonable suspicion that Mr. In was not allowed to possess the firearm. The government notes that before Mr. In was handcuffed, Diaz had been alerted that there was a gun in the car. Mr. In then lied about there being a gun in the car. He also stated that he had been arrested in California and provided inconsistent and suspicious explanations regarding why he was there. He said he had just come back from the shooting range but was wearing sandals, which is not the proper footwear for that activity. He then said he had a gun because he was helping a friend who was being pimped. He also said he bought the gun from someone in California. He appeared nervous. Diaz and Andersen both explained that in their experience, individuals who lawfully possess firearms are

forthcoming about their presence and alert officers right away. Mr. In was in a high drug area and could not provide coherent information as to why he was there. All this information provided reasonable suspicion to further investigate the situation, during which it was lawful for officers to handcuff Mr. In. Further, the government argues, providing *Miranda* warnings did not transform the detention into an arrest. Officers had to handcuff Mr. In because they were on bicycles and could not place him into a patrol vehicle.

The government also contends that the stop was not unlawfully prolonged. First, the mission of the stop included the need to run the national records check, as Mr. In's license and plates were from California. Second, Andersen had reasonable suspicion that Mr. In did not lawfully possess the gun, which also justified the national records check.

**IV.    Analysis**

**A.    Mr. In was not Subject to an Arrest Requiring Probable Cause**

Mr. In does not take issue with officers' initial stop. Instead, he argues that the actions that followed escalated a valid *Terry* stop into an unlawful arrest, because no probable cause existed to believe that he was prohibited from possessing a firearm.

There are two categories of police seizures under the Fourth Amendment: *Terry* stops and arrests. *See Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995). The Ninth Circuit does not have a bright-line rule to determine when a *Terry* stop becomes an arrest, and instead, evaluates the totality of the circumstances. *See Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).

To determine whether a detention is a *Terry* stop or an arrest, courts examine two main components of the detention. *United States v. Edwards*, 761 F.3d 977 (9th Cir. 2014). First, courts examine "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted." *Id*. This component is reviewed "from the perspective of the person seized," assessing whether "a reasonable innocent person in these circumstances would . . . have felt free to leave after brief questioning." *Id*. (*citing United States v. Delgadillo–Velasquez*, 856 F.2d 1292, 1295–96 (9th Cir. 1988)). Second, courts examine "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant

the intrusiveness of the action taken." *Id*. (*citing Lambert*, 98 F.3d at 1185). This "inquiry is undertaken . . . from the perspective of law enforcement," while bearing in mind that "the purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence." *Id*. (*citing United States v. Guzman–Padilla*, 573 F.3d 865, 884 (9th Cir. 2009). "The second inquiry frequently proves determinative." *Id*. The Ninth Circuit has explained that this analysis is "necessary to accommodate our compelling and legitimate concerns for the safety of law enforcement personnel." *Lambert*, 98 F.3d at 1186. Thus, when evaluating the lawfulness of police conduct, courts "must do so in light of the dangerousness of the particular situation" and the officers' need to take "particular measures to protect themselves during the course of the stop." *Id*. Intrusive and aggressive police conduct can be justified—without turning a stop into an arrest—if "it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *Id*.

Here, there is no question that Mr. In's liberty was restricted—he was ordered out of the car with his hands up, patted down, instructed to separate his feet, and handcuffed. He was asked (more than once) whether he had ever been arrested, whether he was a felon, and why there was a firearm in the car. He was also threatened (more than once) that if he did not answer truthfully, he would be in trouble. During this, Mr. In was surrounded by three uniformed officers. Additionally, officers did not explain to Mr. In why he was being stopped, patted down, or handcuffed. It was only well into the stop that Andersen explained the reason for the stop. And officers never explained that they were taking certain actions for their safety.

Under these circumstances, a reasonable innocent person would not have felt free to leave after a brief questioning. This is true even though officers were not aggressive in their actions and no weapons were drawn at any point during the encounter.

The Court next turns to whether the intrusive methods officers used with Mr. In turned his stop into an arrest.[8] Ninth Circuit caselaw makes clear that the use of especially intrusive means of effecting a *Terry* stop is allowed but only in special circumstances, such as

> 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur.

*Id.* at 1189; *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1176 (9th Cir. 2013) (providing same factors).

Here, there was a risk that Mr. In was armed. Seconds into the stop, Andersen noticed a firearm in the back passenger area of the car—easily accessible to Mr. In. Andersen alerted Diaz to this and told him to pull Mr. In out of the car with his hands up. Diaz had worked with Andersen before and given her commands, he felt concerned for his safety. Both Diaz and Andersen testified that typically, individuals who lawfully possess firearms will alert police officers to their presence. Mr. In did not do so. In fact, when questioned about the firearm, Mr. In lied about its presence, twice. Mr. In also provided a suspicious story about being at the shooting range. Additionally, Mr. In told officers that he had previously been arrested. It was at this point that he was handcuffed. (The handcuffing followed a partial pat down, which was completed after Mr. In was handcuffed.)

Importantly, officers did not have a patrol car to place Mr. In in, as they were patrolling on bicycles. Not handcuffing him would have meant risking Mr. In accessing the gun in the car while officers conducted their investigation.

While the court acknowledges that Mr. In gave no indication that he would reach for the gun and that there were three officers present, the ultimate question is whether officers had a sufficient basis to fear for their safety to warrant the intrusiveness of the actions taken. Here, the need to eliminate the possibility that Mr. In could access the gun warranted temporarily

---

[8] Some Ninth Circuit cases state this analysis is a two-step analysis (*see, e.g., U.S. v. Edwards,* 761 F.3d 977, 981 (9th Cir. 2014)), whereas others find that the two steps are combined (*see, e.g., United States v. Bravo*, 295 F.3d 1002 (9th Cir. 2002)).

handcuffing him. Under the totality of the circumstances, the officers' actions were reasonable and did not convert the detention into an arrest. *See United States v. Norris*, 325 F. App'x 522, 523 (9th Cir. 2009) (defendant not arrested when placed in handcuffs during investigatory traffic stop, because officers had reason to believe he may have a gun). This is so even acknowledging that Nevada is an open carry state.

The fact that officers read Mr. In his *Miranda* rights does not alter the analysis. The court already found that a reasonable, innocent person in Mr. In's shoes would not have felt free to leave after a brief questioning. This is especially true after *Miranda* warnings were read. A reasonable, innocent person would not be familiar with the nuances of law to understand that the act of being handcuffed is not necessarily tantamount to an arrest. In fact, movies and television have created the notion that *Miranda* warnings are synonymous with arrests. Not surprisingly, Mr. In immediately asked if he was being arrested after *Miranda* warnings were read. But, as discussed above, this case turns on the second *Lambert* prong and whether the officer's conduct was justified.

It is also worth noting that by the time Mr. In was Mirandized, he had again lied about the presence of the gun. When he finally admitted the gun was his, he explained that he had just left the shooting range. That was suspicious, given the officers' testimony that sandals are typically not worn to the shooting range. The fact that he continued to lie throughout the encounter made it even more reasonable for officers to temporarily handcuff him to continue their investigation without fear for their safety.[9]

---

[9] The Court is mindful of *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990) and the need to find *particularized* (not generalized) facts to support intrusive tactics like the ones used against Mr. In. Here, the Court emphasizes that its holding is narrowly tailored to the facts and circumstances surrounding Mr. In's arrest, which included seeing a teal gun in the back passenger side of Mr. In's car within Mr. In's reach, and that Mr. In lied repeatedly about the presence of the gun in the car. Put another way, the Court finds that the *Terry* stop did not become a *de facto* arrest because, under *Washington*'s second prong, the court found *particularized* facts that suggested officers had legitimate safety concerns. Specifically (1) Officer Andersen saw a gun in the back passenger side of Mr. In's car, and (2) Mr. In repeatedly lied to her about the presence of the gun in the car.

1

**B.      There was Reasonable Suspicion Authorizing the Prolongation of the Stop**

Having determined that Mr. In was not subject to an arrest, the court need not focus on whether officers had probable cause. Instead, the court turns to Mr. In's second argument—that the stop was unlawfully prolonged when the national record check was run.

A traffic violation seizure "justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). A routine traffic stop is more analogous to a *Terry* stop "than to a formal arrest," and it "can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a" ticket for the violation. *Id*. at 354–55. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id*. at 354. Unrelated checks during an otherwise lawful traffic stop must be supported by reasonable suspicion if they prolong the stop. *Id*. at 355.

"Reasonable suspicion exists if 'specific, articulable facts . . . together with objective and reasonable inferences' suggest that the persons detained by the police are engaged in criminal activity." *United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006). Determinations about "reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

Here, there was reasonable suspicion to believe that Mr. In was not in lawful possession of the firearm at the time that the national record checks was run. Mr. In did not alert the officers to the presence of the gun, which Diaz and Andersen testified is contrary to what those in lawful possession of firearms typically do. In fact, Mr. In lied twice about the presence of the gun in the car. This gave Diaz reason to believe Mr. In was hiding something. Mr. In also gave a suspicious answer regarding why he had a gun in the car. He also provided information regarding his criminal history that suggested he might have a prior felony conviction. Lastly, the gun was not holstered or in a box. Instead, it was thrown among other items in the car, which is inconsistent with lawful possession of firearms. All of this created reasonable suspicion that Mr. In might not lawfully possess the firearm. Further, Mr. In had a California ID, and a local records check would

not have revealed any California information. This in turn permitted officers to run a national

records check without impermissibly prolonging the stop. Accordingly,

IT IS RECOMMENDED that Mr. In's motion to suppress (ECF No. 35) be DENIED.

**NOTICE**

This report and recommendation is submitted to the United States district judge assigned

to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation

may file a written objection supported by points and authorities within fourteen days of being

served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely

objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153,

1157 (9th Cir. 1991).


DATED: May 11, 2022


BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE