UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| UNITED STATES OF AMERICA, | Case No. 2:20-cr-00095-ART-BNW |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| LARRY SENG IN, | |
| Defendant. | |

Before the Court is Defendant Larry Seng In's ("In") objection (ECF No. 67) to the Magistrate Judge's Report and Recommendation ("R&R") (ECF No. 64) on In's motion to suppress (ECF No. 35), which recommended that In's motion to suppress be denied. Upon review of the entirety of the record in this case, the Court declines to adopt the R&R and grants the motion to suppress because In was arrested without probable cause and the evidence obtained in this case was a result of the unlawful arrest.

**I.      FACTUAL AND PROCEDURAL HISTORY**

At 6:17 p.m. on the evening of March 4, 2020, officers from the Las Vegas Metropolitan Police Department (LVMPD) (Officers Andersen, Diaz, and Nye), riding bicycles, approached In's vehicle, which was parked less than one block off the Las Vegas Strip in a red zone with a taillight out while In sat in the driver's seat. Officer Diaz approached In at the driver's side window and In began retrieving his registration and insurance information from the glovebox area. (Gov.'s Ex. 1 ("Diaz Bodycam") at 0:00–0:30.) During that time, Officer Andersen shone her flashlight into the interior of In's vehicle. (Gov.'s Ex. 2 ("Andersen Bodycam") at 0:48.) At 6:19:07 p.m., Officer Andersen said, "Diaz hold on. There's

a Glock right there. Tell him to keep his hands up." (*Id.* at 1:04–1:11.) Officer Andersen testified that at that moment she saw a teal-colored Glock firearm on the floorboard behind the passenger seat. (ECF No. 52 ("Hearing Transcript") at 110.)

In was calm and cooperative with the officers when they pulled him out of his vehicle. Officer Diaz told In to get out of his car and not reach for anything. (Diaz Bodycam at 0:59.) In complied by setting his registration papers to the side and immediately putting his hands in the air, while Officer Diaz opened the car door, grabbed In's left hand, and unbuckled In's seatbelt. (*Id.* at 1:00–1:10.) In assisted Officer Diaz and exited the car with his hands behind his back. Officer Diaz held onto In's hands throughout. Officer Diaz pulled In to the front of the rear driver's side door. (*Id.* at 1:10–1:21.)

In was immediately interrogated about weapons. Officer Diaz asked In, "Do you have any weapons on you?" and In said, "no." (*Id.* at 1:25.) Officer Diaz responded "Perfect. Put your palms together." (*Id.* at 1:26.) From the curb, Officer Andersen asked In, "Do you have any weapons in the car?" In denied that he had weapons in the car. (Andersen Bodycam at 1:37.) Officer Andersen testified that she was concerned that In's failure to voluntarily disclose the presence of the firearm indicated he did not lawfully possess firearms. (Hearing Transcript at 114–15.)

While being restrained and frisked, the officers interrogated In about his criminal history. Officer Diaz frisked In's right side with his right hand while continuing to restrain In's hands behind his back with his left hand. Officer Andersen approached In from around the back of the car and asked, "You ever been arrested?" (Diaz Bodycam at 1:32–1:33.) In responded, "Yeah, in California." Officer Andersen asked, "For what?" and In responded "For marijuana," to which Officer Andersen said, "What else?" and In responded, "That's it." (Andersen Bodycam at 1:46–1:52.) In was handcuffed at 6:19:55 p.m. The handcuffs being

used by Officer Diaz made a click sound, though they are not visible on the bodycam video. (Diaz Bodycam at 1:40.) Officer Diaz testified that he handcuffed In due to officer safety concerns and that not having a vehicle to potentially put In into contributed to these concerns. (Hearing Transcript at 52.)

In was questioned while in handcuffs. In asked why he was getting searched. (Diaz Bodycam at 1:43.) Officer Andersen did not answer and instead asked In, "You have no weapons in your car?" to which In responded quickly, "No." (*Id.* at 1:44.) The handcuffs being used by Officer Diaz made a ratcheting sound, indicating they were being tightened, as Officer Andersen asked, "Why is there a Glock back there?" (*Id.* at 1:46.) In responded that he just got back from the shooting range. (*Id.* at 1:53.) Officer Diaz said, "Did you? In some sandals? Do we look new to you?" (*Id.* at 1:54–2:01.) Officer Andersen instructed In that he must answer honestly or he would be in a lot of trouble. (*Id.* at 2:01.) Officer Andersen asked In, sarcastically, "Am I speaking English?" (*Id.* at 2:06.)

Officer Andersen aggressively peppered In with questions. She asked In, "Are you a felon?" to which In responded, "No." (*Id.* at 2:12.) Officer Andersen asked, "Does that belong to you?" and In responded, "Yeah." (*Id.* at 2:13.) Officer Andersen asked, "Why are you so nervous right now?" to which In responded, "Because I didn't do nothing except sit in my car." (*Id.* at 2:15–2:20.) Officer Andersen then explained that the officers had reasonable suspicion to stop In because he was parked in a red zone for an unreasonable amount of time and had a taillight out. (*Id.* at 2:21–2:36.) Officer Diaz then moved In to the curb. (*Id.* at 2:36–2:42.) Officer Andersen asked, "You never been arrested out here?" and In responded, "No, I've never got in trouble in Las Vegas, I never come to Vegas." (*Id.* at 2:52.)

Officer Andersen then called LVMPD's Records office from her cell phone to determine whether In had warrants or convictions in Nevada. (Andersen Bodycam at 3:16; Hearing Transcript at 118.) Officer Diaz read In, still handcuffed, and

3

now standing on the curb, his *Miranda* rights. (Diaz Bodycam at 3:20–3:31.) When In again asked if he was being arrested, Officer Diaz responded, "We like to read you your rights before we go ahead and talk to you." (*Id.* at 3:43.) Officer Diaz asked what In was arrested for in California, and In responded that he had a grand theft on a person, but that he thought that it would no longer be on his record since it had been more than seven years. (*Id.* at 3:54.)

While In stood on the curb, handcuffed and surrounded by officers, Officer Diaz extracted consent from In to search the vehicle. (*Id.* at 5:20.) When Officer Diaz indicated that he got In's consent to search, Officer Nye expressed concern about the validity of In's consent, saying, "He's in cuffs, right?" Officer Diaz protested, "But you still have a firearm. That's still an officer safety thing." Officer Nye pointed out that In was handcuffed (and thus unable to access anything in the vehicle): "Is he in the car right now? Let's find out if there's anything that she [Officer Andersen] finds out. Get what I'm saying?" (*Id.* at 5:25-5:43.)

After several minutes, a fourth officer, Sergeant Leung, arrived in a police vehicle. Officer Andersen had been told by Records that In did not have criminal history or active warrants in Nevada. (Andersen Bodycam at 9:48.) Officer Andersen said to Sergeant Leung and Officer Diaz, "I'm going to Triple I him." A "III" or "Triple I"[1] check is a regulated and non-routine process used to obtain interstate criminal history records. Sergeant Leung appeared visibly uncomfortable with pursuing the Triple I check, asking, "Is he prohibited?" to which Officer Andersen responded, "I don't know yet." (*Id.* at 9:58.) Though still audible on the body camera, Sergeant Leung whispered to Officer Andersen that it is not illegal to have weapons in a car. (ECF No. 29-2 at 10:00–10:27.) Officer Andersen testified that she believed that running the Triple I was necessary because In said that he had been arrested in California and was not truthful at

---

[1] The terms "Triple I" and "III" are used interchangeably and refer to a non-routine interstate records check.

4

points during the encounter. (Hearing Transcript at 129–30.) Using the Triple I, the officers confirmed that In had prior felony convictions in California and recovered the gun. (*Id.* at 65–66.)

Following the Triple I check, the officers obtained a telephonic search warrant from a state court judge to search In's vehicle.

In was charged with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). In moved to suppress arguing that he was arrested without probable cause (ECF No. 35) and the traffic stop was unreasonably prolonged without reasonable suspicion (ECF No. 40). The government responded that In was not arrested and that even if In was unlawfully arrested, the attenuation doctrine should apply to prevent suppression of the evidence. (ECF No. 38.) The government neither articulated probable cause for any arrest nor supplied the warrant to search In's vehicle. The Magistrate Judge held a hearing on the motion on August 5, 2021, at which Officers Diaz and Andersen testified, and ordered simultaneous supplemental briefing. (ECF Nos. 53, 54.) The Magistrate Judge recommended that the motion be denied, finding that In was not subject to a de facto arrest and that there was reasonable suspicion to prolong the stop. (R&R at 21–23.) Because the R&R concluded that In was not subject to a de facto arrest, the R&R did not reach the question of whether the attenuation doctrine would apply in this case. In objected to the R&R's conclusion that he was not subject to a de facto arrest, and the government responded. (ECF Nos. 67, 70.)

## II.     ANALYSIS

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, then the Court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." *Id.* In has objected to the

R&R's analysis and conclusion regarding de facto arrest, so the Court is required to undertake a de novo review of this issue. (ECF No. 67.)

### A. In was arrested.

In claims he was arrested without probable cause in violation of the Fourth Amendment to the United States Constitution, which protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. "There are two categories of police seizures under the Fourth Amendment: *Terry* stops and full-scale arrests." *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020) citing *Allen v. City of Portland*, 73 F.3d 232, 235 (9th Cir. 1995)). Under *Terry v. Ohio*, 392 U.S. 1 (1968), police officers may conduct a brief, investigative stop of an individual when they have reasonable suspicion that the "person apprehended is committing or has committed a criminal offense." *Id.* (citing *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)). A court examines the "totality of the circumstances" to determine whether a detaining officer has a "particularized and objective basis" for suspecting criminal wrongdoing. *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted)). During a *Terry* stop motivated by reasonable suspicion, the officer may ask investigatory questions, but the "scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Unlike a *Terry* stop, an arrest must be supported by probable cause to believe, at the time the arrest is made, that the person being arrested has committed a crime. *Id.*

"There is no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (internal citation omitted). In considering the totality of circumstances, courts may conclude that "[i]dentical police action can be an arrest under some circumstances and not in others." *Id.* at 1186. The "ultimate decision" is "fact-specific." *Id.* "In distinguishing between a *Terry* stop and a full-blown arrest, we consider whether a reasonable person would believe that he or she is being

subjected to more than a temporary detention, as well as the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *United States v. Guerrero*, 47 F.4th 984, 985 (9th Cir. 2022), *amended on denial of reh'g*, 50 F.4th 1291 (9th Cir. 2022) (quoting *United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021)). To determine whether a *Terry* stop has escalated into a full-blown arrest, courts evaluate the severity of the intrusion, including the aggressiveness of the officer's actions, and the reasonableness of the officer's methods under the circumstances. *Reynaga Hernandez*, 969 F.3d at 940 (citing *Washington*, 98 F.3d at 1188–89).

The term "de facto arrest" is used to describe an arrest that lacks the requisite legal justification, namely special circumstances or probable cause. "Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs will violate the Fourth Amendment." *Washington*, 98 F.3d at 1186 (citing *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990), *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988)). In *Washington*, officers used intrusive tactics on two men they suspected of a string of nineteen armed robberies. *Washington*, 98 F.3d at 1186. The court held that the stop amounted to de facto arrest because the use of intrusive tactics on the suspects, including drawing weapons, handcuffing, and placing them in police car, was not supported by information that the men were currently armed or looked like the suspects sought. *Id.*; *see also Del Vizo*, 918 F.2d at 825 (finding de facto arrest when cooperative, unarmed suspect was removed from his car and forced to lie down in the street absent any indication that he was dangerous). As explained in *Washington,* special circumstances justifying especially intrusive means include circumstances "1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have

information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur." *Washington*, 98 F.3d at 1189.

A reasonable person in In's position would believe he was "subjected to more than a temporary detention." *Guerrero*, 47 F.4th at 985. Handcuffing as a means of detaining an individual does not automatically escalate a stop into an arrest, but it "substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *Reynaga Hernandez*, 969 F.3d at 941 (citing *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982); *see also Allen v. City of Los Angeles*, 66 F.3d 1052, 1057 (9th Cir. 1995)). Officer Diaz ordered In to exit the car, opened the car door, grabbed In's left hand and unbuckled his seatbelt. In initially held up his hands before Officer Diaz pressed them behind In's back and Officer Diaz continued to hold them with one hand as he frisked In's right side with his other hand. In, who was alone, was then handcuffed, ordered to separate his feet, and aggressively questioned by two of the three officers, about the firearm and his criminal history.

Having concluded that In was subjected to especially intrusive techniques, the Court turns to the reasonableness of the police conduct. Here the Court analyzes the factors delineated in *Washington* chronologically, beginning with the officers' basis for initiating the traffic stop (factors three and four), and then turning to whether, in light of all the circumstances, including In's cooperative behavior (factor one) upon being removed from the car, frisked, and found unarmed (factor two), the intrusive means were justified based on concern for officer safety. 98 F.3d at 1189.

### 1. Police initiated a routine traffic stop.

Because this case originated purely as a traffic stop, it is distinct from cases in which police were investigating a dangerous or violent crime that immediately preceded the stop. *See Bautista*, 684 F.2d at 1289–90 (police investigating an

8

armed bank robbery); *United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001) (police investigating report that suspect fired shots at a home); *United States v. Edwards*, 761 F.3d 977, 982 (9th Cir. 2014) (police investigating report that suspect was shooting at passing cars). In each instance, the stop closely followed a violent crime. *See Bautista*, 684 F.2d at 1287 (fifteen minutes); *Miles*, 247 F.3d at 1011 (twelve minutes); *Edwards*, 761 F.3d at 980 (five minutes). In *Edwards*, officers responded to a 911 dispatch reporting a shooting and a description that matched the defendant. *Id.* at 979–80. Given the specificity of the matching description and the reasonable suspicion that the defendant was armed, dangerous, and possibly just had committed a violent crime, the officers' use of intrusive tactics (drawing their guns and forcing the suspect to kneel) were justified under the circumstances. *Id.* at 981–82. Similarly in *Miles*, officers, who were responding to a report that a man on a bicycle had fired a gun at a residence, found a suspect on a bicycle fitting the description approximately six blocks from the residence and approached him with their guns drawn, ordered him to kneel and handcuffed him. *Miles*, 247 F.3d at 1011. The Ninth Circuit concluded in *Miles* that the officers' actions were reasonable and did not amount to an arrest because the police had information that the suspect was currently armed and the stop closely followed a report of violent crime. *Id.*

Unlike those examples, here officers initiated a traffic stop while In was sitting in his parked car. Officers were not responding to any reported violent crime and had no tips or information on any violent crime potentially about to occur. As the R&R recognized, although Officers Diaz and Andersen testified that the that the area was a "high drug area," no facts were presented which suggested drug activity at that time. (R&R at 9.) Accordingly, the Court will not grant weight to this assertion under the fourth *Washington* factor. Because this was a routine traffic stop unconnected to any investigation of a dangerous or violent crime, factors three and four do not support the use of intrusive tactics.

9

### 2. In was cooperative and compliant.

Because In was completely cooperative throughout the stop, his behavior did not justify the use of intrusive tactics. Intrusive tactics may be justified when a suspect fails to comply with officer orders, appears agitated, or attempts to reach for a possible weapon or flee. Intrusive tactics have been found to be reasonable when a suspect repeatedly attempted to reach for his inside coat pocket, despite the officers' repeated warnings not to. *See Bautista*, 684 F.2d at 1287 (robbery suspect disobeyed office commands not to reach into pocket); *United States v. Thompson*, 597 F.2d 187, 190 (9th Cir. 1979) (use of handcuffs justified during a traffic stop where a suspect repeatedly attempted to reach inside his coat pocket, despite the officers' repeated warnings not to); *Haynie v. County of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2003) (handcuffing justified for suspect who refused police commands and became belligerent).

Even when police officers are investigating a serious or violent crime, intrusive tactics like handcuffing may not be justified if the suspect is cooperative and compliant. The use of intrusive tactics was not justified in *Washington* because the suspects, although suspected of violent crimes involving weapons, were completely cooperative. *Id.* at 1190. In *Del Vizo* the court acknowledged that even though the defendant was suspected of drug dealing, an inherently dangerous crime, intrusive tactics were not justified because he was compliant and cooperative at all times during the stop. *See* 918 F.2d at 825. In *Green*, despite being stopped on suspicion of a driving a stolen vehicle, the fact that the driver was compliant with law enforcement at all times weighed against a finding that the officers' use of intrusive tactics was justified. *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1048 (9th Cir. 2014).

In's cooperation and compliance with the officers weighs against the use of the intrusive methods. In complied immediately with Officer Diaz's request to keep his hands up and exit the vehicle. In was calm, made no furtive movements,

and a pat down search revealed no weapons on his person. In was handcuffed after the officers confirmed he was presently unarmed. As soon as an officer saw what she believed to be a firearm, officers immediately eliminated any possible risk that In might obtain any weapon from his car. Before the handcuffs were even applied the risk to officer safety had already been neutralized by In exiting the vehicle, unarmed and with his hands up, at which point In did not present a physical threat or flight risk to justify that type of police action.

In's responses to the officer's questions did not elevate the threat level. The government argues that In lied about the presence of the gun in the car and that this contributed to the officers' concerns for their safety. (ECF No. 38 at 8.) While In did give several false or incorrect answers, which merits some weight, the context of those answers matters, specifically the sequence and manner of questioning. It was only after In's hands were restrained behind his back by Officer Diaz that In was asked about his criminal history and about the gun in the car. The first time that In gave a clearly false answer, which was when Officer Andersen asked, "You have no weapons in your car?" and In responded, "no," was at almost the precise moment that the handcuffs were being ratcheted. (Diaz Bodycam at 1:44–1:46.) Once an individual is unlawfully seized no subsequent events or circumstances can retroactively justify the seizure because Fourth Amendment jurisprudence demands that we "prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure." *United States v. Martinez-Fuerte*, 428 U.S. 543, 565 (1976). Because In was already retrained when asked if he had weapons in his car, his restraint cannot be justified by his answers to the questions.

The manner of questioning was aggressive and apparently intended to elicit an incriminatory response. Officer Andersen asked repetitive and leading questions about In's criminal history which gave the impression that she had already determined that In was likely a felon. For example, when Officer Andersen

11

first asked, "You ever been arrested?" as Officer Diaz was beginning to handcuff In, and In responded that he was arrested in California for marijuana (which is likely not a felony), Officer Andersen immediately asked, "What else?" (Andersen Bodycam at 1:46–1:52.) Officer Andersen threatened In several times that he "will be in a lot of trouble" if he failed to answer honestly. (*Id.* at 2:05-2:10.) When In appeared confused, she asked aggressively, "Am I speaking English?" (*Id.* at 2:04-2:06.) She stated aggressively, "you're going to be honest with us or you're going to be in a lot of trouble." (*Id.* at 2:05-2:10.) She repeated, "You're going to be honest with us or you're going to be in a lot of trouble." (*Id.* at 2:10-2:22.) The nature of these questions and statements, combined with the handcuffing and surrounding of In, appear calculated to intimidate In into self-incrimination. The confrontational manner of questioning detracts from the weight of In's incorrect answer.

On balance, In's compliance and cooperation weighs against the officer's use of intrusive tactics in this case.

### 3. In was not armed.

The officer safety issue stemmed from Officer Andersen's having spotted in plain view a firearm in In's vehicle. While every gun presents a safety issue, the question here is whether in the totality of circumstances the mere presence of the firearm inside the vehicle, when In was already outside the vehicle, created an officer safety issue that justified the use of intrusive tactics, including handcuffs. As a preliminary matter, as Sergeant Leung observed at the scene, it is generally legal under Nevada law to have a handgun in a vehicle, *see generally* NRS 202.255–202.362 (setting forth crimes related to firearms), and the officers did not know that In was a prohibited person when they seized him. In evaluating the officer safety risk, four facts are especially important: In was not personally armed, In could not reach the firearm once he was removed from the car, In's behavior did not indicate that he would attempt to reach for the firearm, and In

12

was alone and surrounded by three officers when he was handcuffed and later moved to the curb.

Guided by *Washington*, at no point during the stop was In "currently armed." *Washington*, 98 F.3d at 1189. Here there was no basis to believe that In was armed or dangerous. Upon spotting the firearm, officers removed In from the vehicle, patted him down, and confirmed he had no weapon on his person before handcuffing him.

The location of the gun on the floor behind the passenger seat is significant. In made no furtive movements hinting at danger or concealment. *See Haynie*, 339 F.3d at 1077 (police observed suspect in van make furtive movements "as if to conceal or obtain something"). The risk to officer safety is much lower during a routine traffic stop where there is no suspicion of a violent crime, no furtive movements, and the firearm is in the back of the car. *See Thompson v. Rahr*, 885 F.3d 582, 586–87 (9th Cir. 2018) (holding that officers used excessive force in drawing weapons after suspect was removed from car). In *Thompson*, the Ninth Circuit considered the danger posed by a firearm found in the rear floorboard area of a vehicle during a traffic stop after the officers had removed the driver from the vehicle. As the court stated, "The government's claim that Thompson could have charged past Deputy Copeland and grabbed the revolver in the back of the car in a matter of seconds is weak" because he was already out of and away from the vehicle, had no weapon on his person, and was being watched by an armed deputy. *Thompson*, 885 F.3d at 587. *Thompson* underscores that the risk to officer safety must be grounded in facts. Given all the circumstances here there was a minimal risk that In would access the firearm inside the car because In was already out of the car, unarmed, not within reach of the firearm, and nothing indicated he might reach for it.

In also was alone and surrounded by three officers. *Washington*, 98 F.3d at 1190 (observing that the two to one "ratio of officers to suspects" weighed

13

against the use of intrusive action). The government argues that it was necessary to handcuff In to prevent him from accessing the firearm and that the handcuffs were further justified by the fact that the officers were on bicycles, so they lacked the option of placing In unhandcuffed in the back of a police vehicle. Because In was alone, surrounded by three officers and completely cooperative during the entire stop, nothing about his conduct supported a risk to officer safety justifying the use intrusive tactics, including handcuffs.

The Court finds In was subjected to a de facto arrest because the intrusive tactics used were not justified under the circumstances. The government does not argue that arrest was supported by probable cause. Because this Court concludes that In's arrest was unlawful, it does not reach the inquiry regarding reasonable suspicion to prolong the stop.

**B.     Attenuation does not apply.**

Having concluded that In's arrest was unlawful, the Court must now consider whether suppression is warranted. The government argues that the connection between the potential unlawful arrest and the discovery that In violated 18 U.S.C. §§ 922(g)(1) and 924(a)(2) is too attenuated to warrant suppression based on the unlawful arrest. Specifically, the government argues that because the officers would have conducted a records check on In's identification as a matter of course after having seen the gun, "[t]he recovery of the gun was not the result of any unlawful conduct by the officers." (ECF No. 38 at 12.) Because it is undisputed that the officers saw the gun in plain view, the government's attenuation argument turns on the credibility of its assertion that the discovery of In's prior felonies was unrelated to the unlawful arrest.

The attenuation doctrine is an exception to the usual rule of exclusion or suppression of the evidence. *United States v. Garcia*, 974 F.3d 1071, 1076 (9th Cir. 2020). It applies when "the connection between the illegality and the challenged evidence has become so attenuated as to dissipate the taint caused

14

by the illegality." *Id.* (internal quotations omitted). The Ninth Circuit considers three factors in determining whether an intervening event has sufficiently purged the taint of a preceding Fourth Amendment violation: (1) the temporal proximity between the unconstitutional conduct and the discovery of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.[2] *Id.* (citing *Utah v. Strieff*, 579 U.S. 232, 239 (2016)).

The first factor, temporal proximity, favors suppression. The officers asked In questions about his criminal history while In was handcuffed. To the extent that the motivation to conduct the non-routine interstate Triple I records check stemmed from In's answers to these questions, this evidence was gathered contemporaneously with the constitutional violation. Approximately ten minutes elapsed from In's arrest to Officer Andersen running the Triple I records check. (Andersen Bodycam at 1:04–10:30.)

On the second factor, the presence of intervening circumstances, the Ninth Circuit has distinguished between intervening circumstances driven by "ministerial" duties, such as the execution of the outstanding warrant discovered by the officers in *Strieff*, and circumstances resulting from "volitional" acts of discretionary authority. *Garcia*, 974 F.3d at 1077. The attenuation doctrine does not apply when an officer's volitional decision to exercise discretionary authority is "significantly directed" by information learned because of a constitutional violation. *Id.*

*Garcia* concerned whether police officers' discovery of a condition of supervised release authorizing suspicionless searches was an intervening circumstance that sufficiently dissipated the taint of an unlawful entry. *Id.* at

---

[2] In asserting attenuation, the government does not argue that the evidence subject to suppression is not fruit of the poisonous tree. *See, e.g.*, *Frimmel Mgmt., LLC v. United States*, 897 F.3d 1045, 1054–55 (9th Cir. 2018); *United States v. Gorman*, 859 F.3d 706, 716–17 (9th Cir.), order corrected, 870 F.3d 963 (9th Cir. 2017). In any event, the question of whether the evidence is fruit of the poisonous tree is substantially related to the intervening circumstances factor in the attenuation analysis. *See Gorman*, 859 F.3d at 719.

15

1073–74. The officers in *Garcia* had entered the defendant's apartment during a "protective sweep" of the area relating to another case, and while in the apartment observed evidence of drug activity and learned the defendant's name. *Id.* Because the first entry was held to be unlawful, the court in *Garcia* considered whether the second entry was attenuated based on the discovery of the suspicionless search condition. *Id.* at 1074–75. Noting that the suspicionless search condition did not require the officers to enter the home a second time, the court characterized the second search as "volitional" and held that the officers' decision to exercise their authority to enter the home a second time was significantly influenced by what the officers had seen during the unlawful entry. *Id.* at 1079. The court in *Garcia* observed that "the Government did not present any evidence regarding the officers' reasons for entering Garcia's home the second time, much less evidence sufficient to show that this decision had nothing to do with what they saw inside the home minutes earlier[.]" *Id.* at 1078.

Officer Andersen ran a non-routine interstate records check, the Triple I (or "III"), based on statement's elicited from In during his de facto arrest. LVMPD policy provides that the usage of Triple I is "heavily regulated in the patrol setting" and that "III is only to be used when criminal activity, or the suspicion of criminal activity, can be articulated." (ECF No. 40-1.) "The usage of III for traffic stops (with no reasonable suspicion of current criminal activity) is forbidden." *Id.* An example of an impermissible use of Triple I is when "a driver of a vehicle is pulled over for a broken taillight." *Id.* An example of a permissible use of Triple I is when the officer approaching that same vehicle notices "a bag containing what appears to be illegal narcotics." *Id.* As with the execution of the suspicionless search in *Garcia*, the analysis of this factor thus depends on whether the decision to run the Triple I check was "significantly directed" by information learned as a result of In's unlawful arrest.

The government contends that the officers, irrespective of any arrest, would

have run the Triple I check based solely on the fact that the gun was seen in plain view and would have discovered In's prior felonies. (ECF No. 38 at 11.) But the facts here point the other way. The firearm is not like a bag of illegal narcotics, whose incriminating nature as contraband is immediately apparent. The incriminating nature of the firearm, under the facts of this case, was not immediately apparent without additional information (only discovered by the Triple I check) that In was a prohibited person. Under LVMPD's own policies, observing a firearm while investigating a minor traffic infraction does not authorize a Triple I check. Given the non-routine nature of the Triple I check, it appears from the record that it was In's statements about his criminal history in California, elicited during his de facto arrest, that prompted Officer Andersen to run the Triple I records check. (Hearing Transcript at 129–30.) Officer Andersen testified that she ran the Triple I check because she suspected In lied about his criminal history. (Hearing Transcript at 129–30.) Her testimony confirms that it was In's statements, not the mere presence of the firearm, that "significantly directed" Officer Andersen to run the Triple I check. The second factor therefore weighs in favor of suppression.

The third factor, the purpose and flagrancy of the official misconduct, weighs, on balance, in favor of suppression. Although the considerations relating to officer safety weigh against suppression, the restrictive measures taken went beyond the requirements of the moment. After In was separated from his vehicle and found to be unarmed, he was nonetheless handcuffed by Officer Diaz and aggressively interrogated by Officer Andersen, tactics that do not appear to have been motivated by tangible safety concerns. (*See* hearing transcript at 51:18-21)(Mr. Portz: "Okay. Now after you conducted this pat down of the Defendant in this case you placed handcuffs on Mr. In, is that correct? Officer Diaz: "Yes.") It was only after In was restrained that Officer Andersen peppered him with leading and confrontational questions about his criminal history that appeared to be

17

calculated to intimidate In into self-incrimination. The comments from Officer Nye (doubting the validity of In's consent) and Sergeant Leung (questioning Officer Andersen's decision to run a Triple I check) tend to show that the officers' tactics were aggressive. The third factor thus weighs in favor of suppression.

In sum, the temporal proximity, lack of intervening circumstances, and the purpose and flagrancy of the official misconduct factor all favor suppression. The Court therefore holds that suppression is warranted.

### III.  CONCLUSION

This Court declines to adopt the R&R and grants In's motion to suppress.

IT IS THEREFORE ORDERED that the Report and Recommendation is (ECF No. 64) is REJECTED.

IT IS FURTHER ORDERED that the Motion to Suppress (ECF No. 35) is GRANTED.

DATED THIS 11th day of July 2023.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE